THOMAS B. ELLIS *et al.*

*v.*

BENJAMIN T. SISSON *et al.*

*Filed at Ottawa May 18, 1880—Rehearing denied September 17, 1880.*

1. ASSIGNMENT—*pendente lite does not change equities.* After the filing of a bill by a mortgagor, to set aside and cancel notes and a mortgage given by him, a party acquiring such notes and mortgage by assignment will acquire no equities more than the assignor from whom he took them, and besides this the assignee of a mortgage takes it subject to all the equities in favor of the mortgagor.

2. SAME—*when subject to equities of maker.* Where, after the maker of notes secured by his mortgage has by contract sold and conveyed the mortgaged premises in satisfaction of his indebtedness, the holder places them in the hands of his surety to indemnify him, such surety being a party to the contract by which the debt was to be released, the original creditor can take no superior equity in such notes and mortgage when afterwards transferred to him, but will take subject to all the equities of the mortgagor.

3. PURCHASER—*pendente lite, bound by the result of the suit.* A purchaser of land on execution against a party who, before the recovery of the judgment, had made a sale of the same and tendered a deed to the purchaser who was in possession, and had filed his bill to enforce the contract of sale, is bound by the result of the suit as a purchaser *pendente lite*, and if the vendor succeed, this will show he had no beneficial interest in the land subject to sale on execution.

4. MORTGAGE—*what amounts to its release.* When a mortgage is given by two owners of property to another party, after which the owners make a sale and conveyance of the same to another, who assumes the payment of the mortgage as a part of the purchase money, and gives his notes secured by mortgage for the balance, and such purchaser afterwards sells his interest in the property to the first mortgagee and a new party and the original owner, the two first only executing the contract of sale, for a certain price, the purchasers agreeing to pay the same after deducting the amount due on the first mortgage to one of the purchasers, which contract the vendor substantially performs, this will entitle the vendor to have such mortgage assumed by him canceled, it being a part of the purchase price he was to receive in payment for the property.

5. Where A and B gave a mortgage on mill property to C for $9280, and afterwards sold the mill property, and other real estate and a store to D, for over $33,000, from which was deducted $8000 due from A and A and B to D, for machinery for the mill, and $9780, the amount of his mortgage to C, which D assumed, leaving a balance due A and B of $14,989.54, for which D gave A and B a mortgage on the mill property for that sum, and to A alone his notes and mortgage for $1140 on the land, and afterwards A made a verbal agreement with D for the repurchase of the entire property for his benefit and that of C and E, by which D was to reconvey the property to C and E for D's paid-in interest, which was to be secured by mortgage, and in which C was to have an interest in the property equal to his mortgage, or $9280, and release his mortgage, and E was to purchase D's paid-in interest and to share in proportion to its amount, and A was to have the store and personal property, making the whole equal to the balance due him and B, as they might thereafter agree, and A should surrender the notes and mortgage to him and B, and when, in part execution of this agreement, D by his written contract sold and transferred all the property to A, C and E, the two latter only executing the same with D, who also gave possession of all the property, and afterwards tendered a deed for the property, it was *held,* that this not only operated to release the mortgage to B, but also the mortgages to A and to A and B, and that D was entitled to a first lien upon the premises as against an assignee of the notes and mortgage to A and B.

6. Where there is a verbal contract of a purchaser of property with the former owner, that if the purchaser will sell out the same to two other persons, such former owner will accept such sale in satisfaction of the debt of

such purchaser for the original purchase money, which such purchaser does do by written contract and by surrendering full possession, and he afterwards makes a tender of a deed for the property to such persons, this will operate as a satisfaction of his indebtedness to the former owner.

7. DECREE—*relief limited by prayer of bill.* On bill to enforce an agreement to execute a mortgage on property sold and purchased for the paid-in interest of the complainant in the property, which prayed for an account to be taken of that interest in a store, and that a personal decree might be rendered against the purchaser for the amount of the paid-in interest, it will not be error to refuse to make a personal decree for the value of the goods sold, but such a decree would have been proper had not the prayer limited the relief to the amount of the paid-in interest.

8. PRACTICE IN THE SUPREME COURT—*time to object.* It is a rule of the conduct of judicial proceedings, that advantages in a party's favor will be held waived by not insisting upon them in apt time—by taking steps in a cause without before relying on them.

9. So, where there was an alleged ground of objection to this court entertaining a second appeal in the same case, it was held too late to make the objection for the first time on petition for a rehearing. The question being preliminary in its nature, should have been raised on motion to dismiss the appeal; or at least at the time of the presentation of the case on hearing, in order that it might have been passed upon preliminarily, and before the consideration and decision of the case upon its merits.

APPEAL from the Appellate Court for the Second District; —heard in that court on appeal from the Circuit Court of Peoria county.

One branch of the controversy involved in this record has been previously before this court, in the case of *Sumner et al.* v. *Waugh et al.* 56 Ill. 531, and the entire cause was before the court again in the case of *Cable* v. *Ellis et al.* 86 Ill. 525. In the latter case will be found a statement of the facts, and in the former the written contract of September 30, 1858, upon which the questions in the case so largely arise, will be found set out in full.

A general outline of so much of the facts as may be essential to an understanding of the questions herein discussed, is as follows :

In 1858, John M. Waugh was the owner of about 480 acres

of land in Mercer county, Illinois. He kept a store, and wished to build a steam flouring mill on the premises. For this purpose Benjamin T. Sisson, his son-in-law, joined him, under an agreement by which Sisson was to own a half interest in the mill. Sisson advanced $9280, which was used in the building of the mill.

Thomas B. Ellis, a brother-in-law to Waugh, was carrying on business in St. Louis, and furnished the machinery and fixtures for the mill. Sisson afterward sold out to Waugh, and the latter took in with him Henry B. Ellis, a son-in-law, as well as a brother-in-law. Waugh and H. B. Ellis gave Sisson a mortgage on the mill and mill lot, consisting of two acres of the land, for $9280.58, that being the amount Sisson had put in, in the construction of the mill.

Waugh became involved in debt, and wrote to T. B. Ellis at St. Louis to come up and have some arrangement made for the securing of his claim for machinery and fixtures furnished. T. B. Ellis came, and the result was that T. B. Ellis made a purchase in form of the entire concern, mill, lands, store and other personal property connected therewith, and a five acre tract with a house thereon in which Waugh lived.

The price fixed for the partnership property of Waugh and H. B. Ellis was $32,269.54, and for the Waugh house and five acres $1140. From the sum first named was deducted the Sisson mortgage, $9280, which was assumed by T. B. Ellis, and the amount of T. B. Ellis' claim for machinery, etc., furnished, being $8000, which left a balance coming to Waugh and H. B. Ellis of $14,989.54.

Waugh and H. B. Ellis made a deed to Thomas B. Ellis of the lands and mill property subject to the Sisson mortgage, and Thomas B. Ellis executed his notes to Waugh and H. B. Ellis for said sum of $14,989.54, and a mortgage back on the lands and mill so conveyed to him, to secure the payment of the notes. Waugh at the same time executed to Thomas B. Ellis a deed for the five acre tract and house, and Thomas B. Ellis executed to Waugh his note for $1140 and a mortgage

to secure its payment on this last tract. T. B. Ellis gave Waugh a power of attorney to carry on the business and left for St. Louis. The date of this transaction was June 5, 1858. Afterward, T. B. Ellis, becoming dissatisfied with Waugh's management, came up to the mill and revoked his power of attorney to Waugh, and carried on the business himself for a time, and then on September 30, 1858, sold out, as he alleged, to Waugh, Sisson and John B. Rathbun, also a brother-in-law to Waugh, all the property real and personal, on the terms stated in the written contract of that date above mentioned, signed by Sisson and Rathbun of the second part, and Thomas B. Ellis of the first part.

There having been a failure, through disagreement of the parties, in fully formally consummating this contract of September 30, 1858, Thomas B. Ellis, on March 21, 1861, filed his bill in chancery against Sisson, Rathbun & Waugh to set aside and cancel the two mortgages above named from. Waugh and H. B. Ellis to Sisson, and from T. B. Ellis to Waugh and H. B. Ellis; and to compel Sisson and Rathbun to give to T. B. Ellis the security named in that contract for the purchase money of the property thereby sold, it being claimed that he was entitled to such relief under the contract.

Afterward, while such suit was pending, Sisson assigned his mortgage to Sumner & Co., who, on February 8, 1862, commenced a suit in chancery for its foreclosure, making T. B. Ellis, Sisson, Waugh and others defendants. On hearing, the circuit court dismissed this bill of Sumner & Co., and their appeal from that decree was the aforenamed case of *Sumner et al.* v. *Waugh et al.* in 56 Ill. 531.

After the decision of this court in the *Sumner & Co. case,* and while that case and the above mentioned suit of T. B. Ellis were still pending, some time in 1872, Waugh assigned to P. L. Cable the aforenamed notes and mortgage given by T. B. Ellis to Waugh and H. B. Ellis, on June 5, 1858, except two of the notes of $500 each, before transferred to Reynolds & Ely. Cable then filed his bill in chancery on

June 29, 1872, to foreclose that mortgage, making the Ellises and the parties to the other two suits, except Rathbun, parties.

After this, the circuit court, on motion of T. B. Ellis, consolidated the two causes wherein Sumner & Co. and Cable were respectively complainants, with the cause wherein he, T. B. Ellis, was complainant.

T. B. Ellis then filed an amended supplemental bill making all the parties in interest defendants, with the exception of Waugh, who had in the meantime died, and his heirs were made parties.

All the said suits thus consolidated came on for a hearing in April, 1875, and a decree was rendered by the circuit court substantially granting T. B. Ellis the relief prayed for in his bill, from which decree Cable took an appeal to this court, where the decree was reversed, which is the case of *Cable* v. *Ellis et al.* 86 Ill. 525.

After the cause was remanded to the circuit court, the pleadings were amended and new evidence taken, and a decree rendered holding the mortgage of T. B. Ellis to Waugh and H. B. Ellis to be the first lien. The decree was affirmed by the Appellate Court, and T. B. Ellis and Sumner & Co. appeal to this court.

Mr. O. H. BROWNING, Mr. D. McCULLOCH, and Mr. GEO. W. SPAHR, for appellant Ellis.

Mr. ROBERT L. LYONS, for Austin Sumner's admx. and heirs.

Mr. H. W. WELLS, for Cable and heirs of Waugh.

Messrs. JAMES & JACK, for Rathbun.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

The principal question which is here presented respects the priority of lien which has been given to the mortgage of

T. B. Ellis to Waugh and H. B. Ellis, which Cable is seeking to have foreclosed.

By the filing of his bill in 1861, the equities of T. B. Ellis became fixed, so as to prevent any subsequent assignees of the mortgages acquiring any rights thereunder superior to those of the respective mortgagees.

Ellis has therefore to deal with the case, as respects Waugh, Sisson and Rathbun, alone, Sumner & Co. and Cable having acquired their respective interests subsequent to the filing of the bill by Ellis. And besides, under the decisions in this State, the assignee of a mortgage takes it subject to all equities in favor of the mortgagor.

The written contract of September 30, 1858, entered into between T. B. Ellis of the first part, and Sisson and Rathbun of the second part, was an agreement by the party of the first part " to sell, release and convey to the said parties of the second part, all his paid-in interest in the Richland Grove steam mill, store and lands attached to the same, amounting to $10,000, more or less, as shall appear from authenticated bills rendered at the final closing up of this contract, which shall take place within three weeks from this date, when the said party of the first part shall make to the said parties of the second part, their heirs, executors, administrators or assigns, a good and sufficient deed of conveyance of all the lands, mills, house, and all other appurtenances of whatsoever kind, as set forth in a certain mortgage given by the said party of the first part to John M. Waugh and Henry B. Ellis, dated June 5, 1858, reference to which will fully explain boundaries, conditions, etc.; also for a certain mortgage given to John M. Waugh by said party of the first part for the payment of $1140 on five acres and appurtenances, etc., and to yield up to the said parties all of the aforesaid premises peaceably at the signing of this article, and the said parties of the second part agree with the said party of the first part that they will make over the balance, after deducting the amount held by Benjamin T. Sisson, $9280,

and the said $10,000, more or less, paid in by the said party of the first part, and sold to John B. Rathbun (the said John B. Rathbun agreeing to pay to the said party of the first part the said sum of $10,000 at the expiration of seven years, secured by mortgage on the premises sold, and interest at ten per cent per annum, etc.) by mortgage on the premises, in the same manner and on the same or like terms as the said parties of second part may agree with the said John M. Waugh, and it is further agreed that all the parties named in this article shall deliver up all bonds, mortgages, deeds, receipts and papers of whatsoever kind, relating to their contract, so soon as the same is lawfully canceled," etc. This contract, quite obscure in some of its provisions, we considered, and to some extent put an interpretation upon, in the former cases. We decided that T. B. Ellis had substantially performed all of his part of the agreement and was in no default. That the Sisson mortgage was satisfied by the contract of September 30, 1858; that it was a part of the purchase price of the property sold, and by that contract was to be canceled. We do not see why, by the terms of that contract, the same was not also true with respect to the Waugh and H. B. Ellis mortgage. Why it was not equally a part of the purchase price, and to be delivered up and canceled.

By the terms of that contract, "all the parties named in this article shall deliver up all bonds, mortgages, deeds and receipts and papers, of whatsoever kind, relating to their contract, so soon as the same is lawfully canceled." Although Waugh was not a party signing, he was a party *named* in the contract, and we think this mortgage of his was intended to be embraced in this comprehensive language.

We think that the "balance" mentioned in the contract, "after deducting the amount held by Benjamin T. Sisson, $9280, and the said $10,000, more or less, paid in by the said party of the first part and sold to John B. Rathbun," which Sisson and Rathbun were to make over by mortgage on the premises, as they might agree with Waugh, meant the interest

of Waugh represented by this mortgage of his, for $14,989.54, thus implying that that mortgage was to be released, and the amount thereof to be resecured by another mortgage to be given by Sisson and Rathbun, as they should agree with Waugh. And we should before have held the same with regard to this mortgage that we did as to the Sisson mortgage, if the name of Waugh had been signed to that contract of September 30, 1858.

For we said in the *Sumner & Co.* case that the contract seemed to contemplate that the mortgage to Waugh and Ellis was also to be canceled, but that not being parties to the agreement they could not be affected by it.

And in the *Cable case*, " it was doubtless the intention of the contract of September 30th that this latter mortgage (Waugh and Ellis), also, as well as the former (Sisson), should be canceled, so as to give T. B. Ellis a superior lien upon the property for the security of the payment of his paid-in interest, and for the carrying out of such intention, and being impressed with the justice of the claim of T. B. Ellis that he should have such security, we have anxiously sought for some satisfactory ground upon which we might rest the support of such a claim, but we have not been able to discover any." And further on, " the written contract of September 30, 1858, was not signed by Waugh, and we can not hold him as bound by that contract to discharge and release his mortgage, although we may strongly suspect there was a secret understanding to that effect."

The original bill filed by T. B. Ellis was founded on this written contract of September 30, 1858.

The bill alleged "that orator in September, 1858, was desirous of selling the said mill, store, lands and other property, and on September 30, 1858, entered into a written contract with Waugh, Sisson and Rathbun for the purchase and sale thereof, by which said Waugh, Sisson and Rathbun purchased of orator all of said property, real and personal, remaining on hand at that time; and in consideration thereof

8—96 ILL.

Waugh, Sisson and Rathbun agreed to pay him the amount by him expended and paid out in and about the business of himself, of Waugh and Ellis, and of Waugh and Sisson, for machinery, goods, merchandise, etc., and in addition thereto to release orator from the notes and mortgage to Waugh and to Waugh and Ellis, and also from the mortgage to Sisson. That said contract was in writing, and a copy is attached. That said Waugh was intended to be and was equitably a party to said contract. That by said contract orator agreed to sell to said Waugh, Sisson and Rathbun all his paid-in interest in the said steam mill, stock of goods, etc., and other property." Thus showing the written contract of September 30, 1858, was the foundation of the bill. The difficulty before was, in granting relief to T. B. Ellis under a bill containing such allegations.

There was no proof of such a joint written contract or of such a joint contract by Waugh, Sisson and Rathbun, as alleged. The allegations and proofs did not agree.

The amendment which has been made to the bill of Ellis, since the case was remanded, removes the difficulty which before existed. It sets up a separate verbal agreement on the part of Waugh to release his mortgage. The amended bill alleges that Waugh, as well as Ellis, was desirous to have some new arrangement made with regard to the property. That to effect this purpose, Waugh entered into negotiations with Sisson and Rathbun on the one side, and with Ellis on the other; that Waugh made representations to Ellis that he was about to form a partnership with Sisson and Rathbun, and pretended to be negotiating with Ellis for the purchase of the property for himself and Sisson and Rathbun, and thereby induced Ellis to believe that the sale afterwards agreed upon was a sale to Waugh, Sisson and Rathbun, thus explaining the reason which led him to make the statements he did in his bill and answer before filed. That the negotiations made by Waugh resulted in a general plan, which, in short, was that Rathbun was to become the purchaser of

Ellis' *paid-in* interest in the property; that Sisson should release his mortgage and have its amount for his share; that Waugh should release Ellis from the payment of his notes and mortgage to Waugh and H. B. Ellis, and Waugh to have the store and personal property, together with a sum of money or property, making the whole equal in value to the balance due him upon said notes and mortgage, to be secured to him by Sisson and Rathbun, as they might thereafter agree with Waugh, but of the details of this part of the arrangement Ellis was not informed, and that Ellis should turn over all the personal property and execute a deed for the real estate to Sisson and Rathbun for the benefit of themselves and Waugh, as they had agreed among themselves.

That for the purpose of carrying into effect this general plan, Waugh agreed with Ellis that if the latter would enter into and perform the agreement on his part to be made and performed, he, Waugh, would accept such performance in satisfaction of Ellis' indebtedness on his notes and mortgage to Waugh and H. B. Ellis and release the mortgage; that relying upon this agreement of Waugh, Ellis entered into the written contract of September 30, 1858, at the request of Waugh, and made the surrender of the property. That the written contract was but in part the execution of this general plan, and only expresses the manner in which such general plan was to be executed, so far as it was to be executed by Ellis, Sisson and Rathbun.

If there was such a verbal agreement between Waugh and Ellis, as is now alleged, we can have no doubt that this indebtedness of Ellis to Waugh and H. B. Ellis was discharged by the entering into by Ellis and performance of this written contract, which we have found to have been substantially performed by him.

The only inquiry, then, which remains is, whether Waugh did make such an agreement.

As objection is taken to the testimony of Ellis on the last hearing, that it is not competent under the statute, being

taken after the death of Waugh, we will advert only to such of the testimony of T. B. Ellis as was taken during the lifetime of Waugh. T. B. Ellis, in his testimony in 1867, states the contract substantially as he does now. He then said that Waugh made some offers, and witness told him the best he would do. That Waugh said he would see Sisson and Rathbun and let witness know what he could do. That they all, Waugh, Sisson and Rathbun, came down to the mill together, and they closed the trade that afternoon for the mill property. He said the mortgages of Sisson and Waugh were to be released. He states, it is true, the contract was in writing, and so it was, as far as Sisson and Rathbun were to be bound by it. He further said that Sisson and Rathbun were to carry Waugh's interest in the concern without his name appearing; that Waugh's interest was what remained after deducting the paid-in interest of Ellis and the Sisson mortgage. Sisson's interest was to be the amount of his mortgage, Rathbun's the paid-in interest of Ellis, and Waugh's the balance.

Waugh drew up the contract, and witnessed it. Waugh prepared a written release of the mortgage to himself and Henry B. Ellis, for Henry B. Ellis to sign, which he sent to him with a letter, by T. B. Ellis when the latter left for St. Louis to get the authenticated bills for his paid-in interest, with which he was to return within three weeks. On his return within the three weeks he brought this release signed by H. B. Ellis. Further, when the parties were about to disagree concerning the authenticated bills, Rathbun made the objection that Ellis could not give a good title. Ellis turned to Waugh and inquired if he could not, to which Waugh answered: "Yes, if I release." Ellis then asked him if he was not going to release, to which Waugh replied he would if Ellis and Sisson and Rathbun would settle about the bills. Those facts indicate strongly that Waugh had made a verbal agreement to release the mortgage. Soon after the execution of the September 30, 1858, contract, in a

conversation with Griffith, his book keeper, about it, Waugh said that in drawing up the contract he had looked out for his own interest; that those who signed that contract did not know what they were doing.

The witness Joseph Pitman testifies that a week or two before September 30, 1858, he went to Waugh to collect a claim he had against him, when Waugh told him he was about to buy in again in the store and mill, and said, "come back about such a time, and I think we will have it all arranged; myself and Sisson and Dr. Rathbun are about buying in again; I think we will get it all straightened up." He told the witness when to come back, and said if the trade was made he would pay the claim either in goods or money. Witness came at the time appointed. No one was then there but T. B. Ellis. After dinner Waugh, Sisson and Rathbun came together. In the presence of Sisson and Rathbun Waugh then told witness they were about making the trade, and he thought they would get through with it that afternoon in time for him and witness to settle. Pitman then went into the store where T. B. Ellis was, and told him what had been said. Waugh, Sisson and Rathbun then came into the store, and after talking a few minutes at the counter Waugh said, "I will fix up the papers." Pitman then followed Waugh to the desk and asked him if he was going to settle with him. Waugh then told Ellis to pay Pitman off in goods, and Ellis let him have the amount of $86.60 on the claim of witness, and the balance, $6.40, witness got at another time.

This is attempted to be explained upon the pretence that Ellis sold the store to Waugh alone. But we before considered this pretension and the evidence bearing upon it, and held that the sale of the store was made to Sisson and Rathbun, that the written contract said it was sold to them, and that must control, as being the best evidence.

James B. Ellis testifies that Waugh told him he was a partner with Sisson and Rathbun; that they were carrying his interest, and that he told this to Sisson, who made no reply.

The witness Cottenburg testifies that Waugh said he was a partner; that he had his property so fixed he could do business. And after the difficulty commenced, according to the testimoney of Lawhead, Waugh was living on the land, claiming to own it and working the coal upon it for his own benefit.

R. B. Ellis testifies that Waugh was a silent partner with Sisson and Rathbun.

These references, and others that might be made to the testimony, show that there was some sort of an arrangement outside the written contract existing between Waugh and Sisson and Rathbun, by which Waugh was in some way to have the benefit of Sisson and Rathbun's purchase from Ellis.

Sisson says, " I merely took my interest back; that was the extent of my claim, and I was to have an interest in the whole property, to the extent of my claim, as shown by the mortgage."

And must we not believe, from the circumstances, that the case was the same with this other mortgage held by Waugh, and by his agreement?

Waugh testified that he supposed that the papers referred to in the contract as to be delivered up, meant all the papers held against T. B. Ellis on account of this property. He therefore understood the contract contemplated the surrender of his mortgage, and if he has participated in the enjoyment of the full benefit of the contract, it is but right that he should surrender the mortgage.

Waugh appears ever to have been the central figure in the whole concern of this property, and to have been the prime actor in bringing about the arrangement which resulted in the written contract of September 30, 1858. The purpose of the transaction appears clearly enough to have been a change of the relation of Ellis toward the property from that of vendee to that of mortgagee,—to let Ellis out of the concern, just as if he had never purchased it, and to give him security for his paid-in interest.

The making of the written contract of September 30, 1858, seems to have been only one step in the carrying out of a scheme which we think had been devised by Waugh. That contract undoubtedly expresses all that was intended, so far as Ellis, Sisson and Rathbun were contracting parties with each other; but there were other agreements relating to the subject matter among the different parties interested, which that contract does not express.

We are satisfied, from the evidence, that outside of this written contract there was a verbal agreement between Waugh and Ellis, to the purport that if Ellis would sell out to Sisson and Rathbun, he, Waugh, would accept such sale in satisfaction of the debt of Ellis to Waugh and H. B. Ellis.

We think that, by virtue of this agreement, and the transfer of the property, which was made by T. B. Ellis, and the full enjoyment of it ever since by Sisson, Rathbun and Waugh among them, the notes and mortgage to Waugh and H. B. Ellis were satisfied; and as those to Sisson are also satisfied, that T. B. Ellis is entitled to a first lien upon the property for his paid-in interest.

This necessarily subordinates the lien of Sumner & Co., giving them but the second lien for the amount of their claim.

Since this case was last before this court Sumner & Co. have also amended their cross-bill by setting up that they have obtained title to the lands in controversy by virtue of a conveyance from one John C. Wharton. Wharton was an execution purchaser under an execution issued upon a judgment against T. B. Ellis rendered in 1871. Although the legal title then appeared to be in Ellis, it was but a naked legal title, the equitable interest being in Sisson and Rathbun, or Sisson, under the contract of September 30, 1858; and Ellis having tendered a conveyance which had been refused to be received. The judgment and sale were long after this litigation had been commenced, and while it was pending, and the purchasers would be bound by the result of this suit as purchasers *pendente lite.* Ellis had no beneficial interest

with respect to the land, other than having a vendor's lien, or as mortgagee. There would be nothing in this regard which would be bound by the judgment or pass under execution sale. We have frequently held a vendor's lien not to be assignable; and in *Delano* v. *Bennett*, 90 Ill. 533, we held that a conveyance of a mortgagee's interest in land, without an assignment of the debt, passed no title.

It appears there was an indebtedness of Waugh to Sumner & Co.; that Sisson had assumed to pay this indebtedness, and that to indemnify Sisson on account thereof, Waugh gave to Sisson these notes of T. B. Ellis to Waugh and H. B. Ellis, and which Sisson held for some time. These notes, then, having thus been placed in Sisson's hands as a security to indemnify him against this indebtedness of Waugh to Sumner & Co., which Sisson, as surety for Waugh, had assumed to pay, it is contended that Sumner & Co., the principal creditors, are entitled to the full benefit of that security. It is sufficient to say, as to this, that it was not until after the contract of September 30, 1858, that the notes were thus placed in the hands of Sisson, and any equity of Sumner & Co. in the respect claimed, must be subject to the prior equity of Ellis to have the notes delivered up and canceled.

It is further complained of on the part of Ellis, that the circuit court rendered a personal decree against Rathbun, in case of deficiency of the proceeds of the mill and lands, for only the amount of Ellis' paid-in interest in the store, instead of for the full amount of the goods. This decree seems to be in accordance with the opinion of this court given on the rehearing before, and we think it now too late to call in question our former decision in this respect.

The paid-in interest in the store was what the contract purported to sell, and the bill of Ellis prayed that the court, upon final hearing, might take an account and determine the amount of complainant's paid-in interest in the store, and that a personal decree might be rendered against Sisson and

Rathbun for the amount of such interest.   So that the bill only seemed to have asked a personal decree for the amount of the paid-in interest in the store, and not for the value of the goods.

But the court only allowed for this paid-in interest in the store, $53, for account books and a small freight bill.   This sum appears to us to be too small.   The goods invoiced at $4021.02, and the other personal property, $675, making in all $4769.02, and as this was all turned over unincumbered by Ellis to Sisson and Rathbun, and Ellis was to have security on what was sold for his entire paid-in interest in mill as well as store, there seems no sufficient reason why the personal decree against Rathbun, in respect to the goods, should not be for their value, had not Ellis in his bill limited the personal decree asked to his paid-in interest in the store.

We do not see how the finding of the master that Ellis had withdrawn from the store goods amounting to $2500, is supported.   The goods invoiced May 5, 1858, when Ellis took them, $3351.74, while the same stock invoiced October 5, $4021.02.   It is true, Ellis had sold to the amount of $2500, but it does not appear that he had withdrawn all this.   The book accounts and notes taken for goods sold were turned over under the contract, and Ellis seems in the meantime to have added to the stock sufficient to make it more than it was when he purchased.

And we do not perceive upon what evidence the master found that Ellis resold the goods for $3351.54.   He sold his interest in the entire concern for what he had invested in it, which appears to have been $9866.63.

It seems agreed this was the amount of the entire paid-in interest in mill and store.   And the paid-in interest in the mill seems to have been $8000.

What but the paid-in interest in the store does the difference between these two sums represent?

We are not satisfied with the finding as to the amount of the paid-in interest in the store.   We leave this matter of the

amount of Ellis' paid-in interest in the store open for further inquiry and determination in the circuit court.

There appears to have been some taxes paid by Sumner & Co. Whatever taxes they have paid should be first reimbursed to them from the proceeds, with interest.

The decree of the Appellate Court is reversed, and the cause remanded for further proceedings in conformity to this opinion.

*Decree reversed.*

DICKEY, J: I can not concur in this decision. The alleged oral agreement was not set up, as I think, in apt time, and it is not satisfactorily proved. As against Cable, who bought in ignorance of the same, it ought not to prevail.

Subsequently, upon an application for a rehearing, the following additional opinion was filed:

Per CURIAM: Petitions for a rehearing in this case have been filed on the part of P. L. Cable and the heirs of J. M. Waugh and J. B. Rathbun.

After a careful consideration of the grounds of the petitions, upon the merits of the controversy between the parties and the questions heretofore presented, we feel satisfied with our former opinion and judgment, and see no reason for changing the same.

One new question is now for the first time presented to our attention by Cable, as a ground for a rehearing, which is as follows:

When the case was last before us we reversed the decree, and remanded the cause for further proceedings in conformity with the opinion then rendered. On the case being remanded to the circuit court that court allowed an amendment of the bill by setting up, in substance, that the agreement of Waugh in the bill mentioned was by parol instead of in writing, as alleged in the original bill, and further proofs were taken.

It is now, on this petition for a rehearing, urged for the first

time that it was error to allow the bill to be amended and hear further proofs, and that a second, the present appeal, should not be entertained. Without passing upon the merits of this question, we think it is too late now, upon this petition for a rehearing, to raise it for the first time.

It is a familiar rule of the conduct of judicial proceedings, that advantages in a party's favor will be held waived by not insisting upon them in apt time—by taking steps in a cause without before relying on them. The question here was properly as to entertaining the appeal—it was preliminary in its nature—and should have been raised on motion to dismiss, or at least at the time of the presentation of the case on hearing, in order that it might have been passed upon preliminarily, and before the consideration and decision of the case upon its merits.

Had this course been pursued, if the objection was a valid one it might have been passed upon at the threshold, and the court been saved the great labor of the examination of this voluminous record and the decision upon the general merits of the questions involved in this controversy. But without making objection in this court to the entertaining of the appeal, or to the action taken by the circuit court after the cause was remanded, the counsel for this petitioner went on and presented an argument and submitted to us for decision the case upon the entire merits of the controversy between the parties, irrespective of any irregularity in the proceeding subsequent to the remanding of the case, or in taking the appeal.

The ground of the objection to the course pursued by the lower court in allowing a new question to be presented and heard by the amendment of the bill and taking further proofs, is, that it encourages delay and protracts a final decision. But the very same objection lies to the present application of this petitioner. He lay by and presented the case on argument and for decision without raising the present question. Now, for the first time, after a final decision, he presents this ques-

tion upon a petition for a rehearing, which he ought to have raised to the court before the submission of the case for decision. All his points ought to have been then made.

To allow such a practice as the present, has the same tendency to encourage delay and prolong litigation as the action in the circuit court which petitioner now complains of, and asks an opportunity, after the case is decided, to present to this court for review.

To prevent great injustice we might permit this to be done. But we are entirely satisfied with the present decision as doing equity between the parties. We think it carries out the intent and purpose of Waugh that his mortgage should be canceled.

And we expressed ourselves to this effect in both our two former opinions in the cases of *Sumner et al.* v. *Waugh et al.* 56 Ill. 531, and *Cable* v. *Ellis et al.* 86 id. 525, as stated in our opinion herein. A reason we could not determine in favor of Ellis' priority in those cases was, that Waugh's alleged agreement to cancel his mortgage was set up as being in writing, and we could not find that he had signed the alleged written contract.

But after the amendment of the bill alleging the agreement to be by parol, we found no variance between the allegations and proofs, and saw our way to decide as we did, in favor of Ellis.

The objection which petitioner now seeks the opportunity to avail himself of, is one as to the mode of procedure only, and not touching the real equities of the case.

The question on this appeal is not the same as that decided on the former appeal. On that appeal it was, whether Waugh was bound to cancel his mortgage by virtue of a written contract alleged in the bill. On this appeal it is, whether he was so bound by virtue of a parol contract.

We think we may properly refuse to this petitioner a rehearing, in order to afford to him an opportunity to present for

consideration this new point which he failed to make before in the case.   A rehearing is denied, as to both petitioners.

*Rehearing denied.*

DICKEY, Ch. J.:   I think the rehearing ought to be granted. The record is very voluminous, and I can not examine it in detail at present.   If other duties permit, I will present my views hereafter.