THE SPRING VALLEY COAL COMPANY

*v.*

SIMON BUZIS.

*Opinion filed December 22, 1904—Rehearing denied Feb. 8, 1905.*

1. MASTER AND SERVANT—*what tends to show negligence on the part of hoisting engineer at mine.* It is the duty of a hoisting engineer at a mine to use reasonable care to control the movement of the cages in the shaft, and proof that he put a cage in such rapid motion that it struck the bottom of the shaft with great violence tends to show negligence by engineer in operating the machinery.

2. SAME—*when court cannot say that release by a servant bars action.* The trial court cannot declare, as a matter of law, that a release of damages by an injured servant operates as a bar to his action for damages, where there is evidence that his signature was obtained through fraud and circumvention.

3. RELEASE—*release of damages obtained by fraud is void.* A release of damages obtained from an injured servant by the fraud of an interpreter, who represented it to be a receipt for money advanced by the master for doctor's bills, is void if the interpreter is the representative of the master; and the consideration need not be returned nor the release canceled in equity before an action at law for damages can be maintained.

4. APPEALS AND ERRORS—*when alleged error is waived.* Alleged error of the trial court in refusing certain of defendant's instructions is waived in a court of review where his brief does not disclose the ground of objection to the trial court's action nor discuss the instructions.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. JONAS HUTCHINSON, Judge, presiding.

A. R. GREENWOOD, and HENRY S. ROBBINS, for plaintiff in error.

DANIEL BELASCO, and COLLINS & ABRAHAM, for defendant in error.

Mr. JUSTICE BOGGS delivered the opinion of the court:

The plaintiff in error company in July, 1901, owned and operated a coal mine at Spring Valley. The defendant in error was then in the employ of the company in the capacity of a miner. The vein of coal that was being mined was about five hundred feet below the surface of the ground, and the plaintiff in error maintained and by means of a steam engine operated two elevators or cages which it used for the purpose of lowering its workmen into and hoisting them out of its mine, and also for the purpose of hoisting coal. The opening of the shaft was enclosed within a building known as the "tower." This tower was of the height of seventy-five feet, and it enclosed the engine room. The engineer controlled the movements of the cages from his station in the engine room, which was about fifty feet from the mouth of the shaft. He could not see the elevators or cages from his place in the engine room, but set his engine in motion to lower or raise the cages on signals made by a workman of the plaintiff in error company known as the "top cager," who was employed for that purpose and was stationed at the top or mouth of the shaft. On the 8th day of July, 1901, the defendant in error and ten other miners in the employ of the plaintiff in error company entered one of the elevators or cages to be conveyed down the shaft to the bottom of the mine. At a signal given by the top cager the engineer put the machinery in motion to lower the cage, and the cage was let down with such rapidity that it struck the bottom of the shaft with great force and violence, and seriously injured the defendant in error and also other of the workmen. The defendant in error, in an action on the case

instituted in the superior court of Cook county, was awarded judgment in the sum of $2500, and the Appellate Court for the First District affirmed the judgment on an appeal prosecuted by the company. This writ of error asks the reversal of these judgments.

It is first complained that the court erred in overruling the motion, entered by the plaintiff in error company, to direct a peremptory verdict in its favor. Two reasons are advanced in support of this position: First, that there was no evidence tending to show that the injury received by the defendant in error was the result of any negligence on the part of the plaintiff in error company; and second, that the defendant in error, for a valuable consideration, executed, under his hand and seal, and delivered to the plaintiff in error, a release of any and all claim for damages because of or arising from the injuries received by him.

It was the duty of the engineer to exercise reasonable care to control the downward motion of the cage, to the end that it should convey the persons riding therein to the bottom of the shaft without injury. The evidence tended to show that he put the cage in rapid and dangerous motion, and that it moved with such speed as to strike the bottom of the shaft with great force and violence. The mere fact that an employee has been injured is not sufficient to establish that an employer was guilty of negligence and may have no tendency to show that the injury was the result of negligence on the part of the employer, but the manner of and circumstances under which an injury was received may furnish proof of such negligence. The fact, in the case at bar, that the cage was allowed to descend with such great rapidity and force, tended to show negligence on the part of the engineer in handling and operating the machinery.

The court could not declare, as a matter of law, that the release operated as a bar to the right of the defendant in error to recover, for the reason there was evidence tending to show that the signature of the defendant in error thereto

was obtained through fraud and circumvention. It was proven that the defendant in error was unable to read or clearly understand the English language. His tongue was Lithuanian, but he could speak a few words in English. In the interview which resulted in the execution of the paper purporting to be a release, one Mr. Novak acted as interpreter. He died prior to the hearing. The purported release was dated July 17, 1901,—about nine days after defendant in error received his injuries. He was then confined to his bed. The defendant in error, as interpreted, testified: "I remember when I made my mark on this paper (referring to the paper handed witness.) It was three or four days after I was hurt. There were present a clerk, interpreter and somebody else. They said that they would give $35 to pay the doctor's bill. They said when they gave money you must give a receipt for the money. The man that gave the money spoke to me, but I said that I can't write. He says, 'It is nothing.' I talked in the Lithuanian language. They said they would give money for medicine. He was talking to me. He told me, 'We will give you money for medicine.' I gave a receipt for the $30. Nothing else was said to me about this paper.

Q. "Did Mr. Novak tell you what is on that paper, and then you tell him what is on that paper? (The interpreter here translated said document to the witness.)

A. "No, he didn't say that. Mr. Novak said that you must give a receipt for the money."

Charles Buzis, a son of the defendant in error, testified, in substance, that he was present when the paper was signed, and that he speaks both English and Lithuanian, and that Mr. Novak spoke to his father in the Lithuanian language. He further testified: "The first thing Novak said to my father when he came in was, 'How are you making out?' and my father said he is awful sick now; he got his leg broke. Mr. Novak then said, 'We came over here to see you; we came over to settle the case,' and my father said

he won't settle the case until he gets better. Novak then told my father they would try to help him along and give him $30 or $35 doctor's bills, for to help him along until he gets better, and my father said all right. After that they took out a receipt. I don't know now which one of the fellows took it out. The man that did it was the highest clerk, I think, of the Spring Valley Coal Company. He took it out of his pocket and told my father to sign down his name, and he said he didn't know how to write, and he told him to put a cross on the receipt, and so he did. Mr. Novak told my father what he put his mark on the paper for. He said, 'That is for the $30,—for the $35.' He didn't read the paper to my father or tell him that this receipt released the company from all claims and demands for his injuries. Mr. Novak did not repeat to my father in the Lithuanian language what you have just read to me, being the contents of that release. He said that was the receipt for the $30. That is all I know that he told my father."

Plaintiff in error insists that there was no proof that the representatives of the company made any misrepresentations whatever to Mr. Novak to be translated to the defendant in error, and could not understand the language in which Novak spoke to the defendant in error, and if Mr. Novak deceived the defendant in error with reference to the character of the instrument to which the defendant in error made his mark, it was the deceit and fraud of the interpreter, and that the interpreter was acting as the agent of the defendant in error. There was a conflict in the testimony as to the party for whom Mr. Novak was acting. The son of the defendant in error testified that Novak said to his father: "We (clearly meaning himself and the representatives of the plaintiff in error company who were then present,) came over to see you; we came over to settle the case," and that his father said "he would not settle the case until he got better," and that Novak said "they would try to help him along until he got better, and would give him $30 or $35 for that purpose,"

etc. We find nothing in the record to show that Novak was present at the request or instance of the defendant in error, and the statement made by Novak, as testified to by Charles Buzis, tended to show that Novak came there with and was acting in conjunction with the representative of plaintiff in error. There was therefore evidence tending to show that defendant in error was deceived into signing the release by the belief that the paper he was signing was a receipt for money advanced by the company to enable him to pay for medicine and the services of a physician, and that he did not intend to execute a release of damages or understand that he was signing a release. It is competent to show, in an action at law, that the execution of a release was obtained by fraud and circumvention. It was a question of fact to be determined by the jury whether the execution of the release was obtained by fraud and circumvention. The instrument was void if so obtained, and it was not necessary to return the consideration or to remove the instrument by a decree in chancery out of the way of the maintenance of the action at law. *Papke* v. *Hammond Co.* 192 Ill. 631; *Indiana, Decatur and Western Railroad Co.* v. *Fowler,* 201 id. 152.

The court did not err in overruling the motion for a peremptory verdict.

It is assigned as for error that the court refused the first and fourth instructions asked in behalf of the plaintiff in error, but the brief of counsel does not disclose the ground of objection to such action of the court or discuss either of the instructions. The point is therefore waived.

The judgment must be and is affirmed.

*Judgment affirmed.*