## Frank W. Ravlin, v. Chicago, Aurora & De Kalb Railroad Company et al.

## Harvey Gunsul, Receiver, et al., Defendants in Error, v. Frank W. Cherry, Plaintiff in Error.

### Gen. No. 6,593.

1. RECEIVERS, § 47*—*not permitted to profit from transactions.* A receiver will not be permitted to derive personal profit out of his office other than the compensation which the court may allow him, and may not traffic in his own behalf in the property committed to him by virtue of his office.

2. RECEIVERS, § 20*—*what is nature of office.* A receiver is in legal effect a trustee.

3. APPEAL AND ERROR, § 420*—*necessity for objection to petition in lower court.* The insufficiency of a petition on the ground that it alleges conclusions and not facts should be raised in the lower court.

4. RECEIVERS, § 47*—*sufficiency of pleading in action to recover secret profits.* In a suit against one to recover secret profits alleged to have been made by him in dealing with the subject of the receivership while he was receiver, it is not important that the methods employed by him are not termed a fraud in the pleadings.

5. APPEAL AND ERROR, § 1160*—*limitation on rehearing to points urged in original brief.* Defendant, in a suit to recover from him profits alleged to have been made by him through secret sales, made during the receivership, of stocks and bonds of a company for which he was receiver, is confined, on appeal from a decree against him and on a rehearing in the Appellate Court, to questioning such decree on the grounds assigned in his original brief, and cannot secure the investigation for the first time on such rehearing of

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

proof for and against the items passed upon by the lower court in ascertaining the amount of his profit.

6. APPEAL AND ERROR, § 1160*—*what cannot be raised on petition for rehearing.* On a rehearing, points not presented in the argument of the cause will not be considered, and points not made in the original brief are waived and cannot be raised for the first time on the petition for rehearing.

7. RECEIVERS, § 47*—*when evidence sustains recovery against receiver for secret profits.* On a bill against one to recover secret profits alleged to have been made by him through secret sales of stocks and bonds of a company of which he was receiver, evidence considered and *held* to show that the transactions involved were consummated during the receivership and to support a decree against defendant for the amount found to have been received by him as profit.

8. RECEIVERS, § 47*—*when payment on unsecured debt to prejudice of secured creditors not allowed.* A·payment made by a receiver on an old and unsecured debt of the company without any order of the court and to the prejudice of the secured creditors should not be allowed.

9. RECEIVERS, § 49*—*when not required to refund compensation paid attorney.* A receiver will not be required to refund to his successor compensation paid an attorney employed by him under authority of the court, such attorney's estimate of the value of his services being uncontradicted, merely because as to one of the matters submitted to him such attorney adopted an erroneous view of the law.

10. RECEIVERS, § 50*—*when entitled to compensation although required to refund secret profits.* Even though a decree be entered against a receiver requiring him to refund secret profits made by him in selling stocks and bonds of the company during the receivership, he will not be denied ordinary and just compensation for his services as receiver, it appearing that he was diligent in the performance of his duties and did not credit himself with excessive compensation.

11. INTEREST, § 47*—*time from which computed against receiver on secret profits.* A decree finding against a receiver secret profits made by him through the sale of stocks and bonds of the company during his receivership should bear interest on the amount of such profit from the date of the closing of the transaction in which they were acquired.

12. RECEIVERS, § 47*—*status of receiver where payment charged back against him.* Where a decree charges back to a receiver an amount paid by him without authority of the court on an old and

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

unsecured claim against the company, he should be charged interest on such payment from the date it was made to the date of the decree and should be awarded, as to such amount, the position of an unsecured creditor with a right to interest thereon from the date the payment was made.

Error to the Circuit Court of Kane county; the Hon. C. F. IRWIN, Judge, presiding. Heard in this court at the October term, 1919. Affirmed in part, reversed in part and remanded with directions. Opinion filed March 9, 1920.

JOHN A. RUSSELL, for plaintiff in error.

JOHN K. NEWHALL, for defendant in error Harvey Gunsul.

PEFFERS & WING, for defendants in error Enos Doan and George A. May.

MR. JUSTICE DIBELL delivered the opinion of the court.

The Chicago, Aurora & De Kalb Railroad Company (hereinafter called the company) operates an interurban road. In 1913, J. H. Bliss and W. S. Kirby were appointed receivers of the company in this cause and served until July 10, 1916, when Frank W. Cherry became receiver. At the September term, 1917, of the circuit court of Kane county, Cherry resigned. His final report was approved and his resignation accepted. Before the end of that term, on motion of Enos Doan and George E. May, creditors of the company, the order approving said report was vacated. Thereafter Doan and May, by leave of court, filed an intervening petition, attacking various acts of Cherry as receiver, and especially charging that while receiver he had made large profits from secret sales of the stock and bonds of said company. About that time the holder of certain bonds of the company filed a bill to foreclose the trust deed securing said bonds, and in that cause

Harvey Gunsul was appointed receiver of the company. Thereafter, Gunsul, as receiver, by leave of court filed in this cause an intervening petition attacking the conduct of Cherry as receiver, which petition was similar to that of Doan and May. Cherry answered these petitions and they were heard together, and there was a decree directing Cherry to pay to Gunsul as receiver $47,066.71 as profit which the court found Cherry, while receiver, had made on the sale of certain securities of the company, and $3,000 which the court found Cherry had paid a certain bank without authority of the court, and $2,350 which the court found he had paid his attorney without authority of the court. Cherry sued out a writ of error to review said decree. Gunsul assigned cross-errors, in which he insisted that the court should have required Cherry to repay all compensation for his services as receiver for which he had been credited in his report; and should have charged Cherry with interest at 5 per cent per annum upon said profits and upon the $3,000 paid the bank. We affirmed the main portion of the decree, but reversed it upon some minor matters. There was one error in the opinion we then filed in reciting an important date, but the other parts of the opinion showed it was merely a clerical error and the court did not mistake the fact but intended to recite the true date. Cherry petitioned for a rehearing and so earnestly contended that a great injustice had been done him that we granted a rehearing.

On February 13, 1917, in a suit brought against Cherry as receiver, certain bonds of the company were sold by the master in chancery (which office Gunsul then held), which shortly thereafter were turned over to a bank for one H. H. Evans. It is claimed by the petitioners that said proceeding was instituted at the expense of Cherry and by his procurement while he was receiver; that the object was to enable him to fulfil a contract he individually had with Evans; that he

SECOND DISTRICT—MARCH, 1920.    217

Ravlin v. Chicago, Aurora & De Kalb R. Co., 217 Ill. App. 213.

concealed from the court that he had such contract with Evans and had a written agreement with Evans by which Evans was to pay much more for said bonds than they brought at said sale; that thereby while receiver and because of his concealment of the true facts from the court, Cherry made a large profit for himself; and that he must in equity surrender that profit. Cherry contends that he completed his contract with Evans and earned and obtained all his profits on or before June 28, 1916, before he became receiver, and that he did nothing afterwards inconsistent with his duty as receiver, and that whatever he did afterwards in the matter was at the request of Evans and for the accommodation of Evans, and without profit to himself, and without his having any interest therein.

The law is well settled that a receiver will not be permitted to derive personal profit out of his office, other than the compensation which the court may allow him, and that he may not traffic in his own behalf in the property committed to him by virtue of his office. *Michoud v. Girod*, 4 How. (U. S.) 503; *Magruder v. Drury*, 235 U. S. 106; *Baker v. Schofield*, 243 U. S. 114; 34 Cyc. 254, 255. A receiver is in legal effect a trustee. The above rule was announced as to trustees in *Farwell v. Pyle-Nat. Elec. Headlight Co.*, 289 Ill. 157, and in cases there cited.

There are between 80 and 100 exhibits in this case, some of them containing lengthy and involved financial propositions, acceptances thereof, modifications, trust agreements, financial statements, correspondence, decrees and orders in another cause, and the like. A full statement of all the transactions in the stocks and bonds of this company, and of all the schemes and attempted schemes concerning it in which the parties have been involved, with a full explanation of the reasons for every step, would fill a volume. We deem it sufficient to give a mere outline of the transactions.

Henry H. Evans of Aurora, a capitalist, had ob-

218 APPELLATE COURTS OF ILLINOIS.

Ravlin v. Chicago, Aurora & De Kalb R. Co., 217 Ill. App. 213.

tained charters for two interurban roads. He conceived the plan of buying a controlling interest in the stocks and bonds of this company and uniting the property of this company with his other interurban schemes. The company had a capital stock of $950,000. It had issued $200,000 of first mortgage bonds, secured by a first trust deed, and thereafter had executed a second trust deed, securing $750,000 of what it called general mortgage bonds. Only a portion of the latter had been issued, and $50,000 of the first mortgage bonds had been taken up and reissued. The par value of each share of capital stock and of each bond was $100. It seems that frequently a certificate for one or two shares of stock was issued with one bond, when the latter was sold, in other words, the bonds had been used as a vehicle for the sale of the stock. It was a controlling interest in the capital stock and in the outstanding mortgage bonds of this company which Evans wished to secure. Cherry had had experience in handling such properties. Evans orally offered to Cherry that he would pay Cherry certain prices for enough of said stocks and bonds to secure control. Evans made it a condition with Cherry that he (Evans) was not to be known in the transaction. Cherry made investigations to see whether those securities could be obtained. He found that theretofore the company had given various promissory notes to various banks, and that each of said notes had been indorsed by the seven directors of the company, who were George, Richmond, Bliss, Erlenborn, Loser, Klein and Ravlin; that afterwards, said banks demanded further security, said directors had deposited with said bank, as collateral security, a large number of bonds of the company, some of them being first mortgage bonds and others second or general mortgage bonds, and that afterwards, the banks demanding payment, said notes had been taken up by said indorsers with their respective

collateral securities, and placed in the hands of W. C. Estee under a trust agreement by which he was to hold said securities for the benefit of said seven directors, each of whom had an equitable lien upon one-seventh thereof, and said trustee gave to each of said seven directors a separate paper, evidencing the trust. Each of said directors also owned a large amount of the capital stock of the company, said to have aggregated $387,600 at par value. Thereupon Cherry sought to buy said bonds and stock. He found that he could not at that time deal with George or Erlenborn.

Under date of June 6, 1916, Cherry made a written proposition to the other five of the seven directors to buy their interests in the Estee agreement and in the collateral bonds and in the capital stock, and to pay therefor certain sums within certain times thereafter. Said five directors accepted the proposition. This proposition and acceptance will be called the Bliss-Cherry contract. On June 12, 1916, Evans and Cherry made a written contract concerning those securities, by which Cherry was to obtain said controlling interest and sell and assign the same to Evans, and also obtain the remaining two-sevenths interest in the Estee agreement and the securities therein mentioned, and in the capital stock owned by George and Erlenborn, and deliver these to Evans as soon as he received them, and Evans was to pay certain sums therefor. This is called the Evans-Cherry contract. On June 15, 1916, said five directors made a written supplemental contract with Cherry, by which Cherry might immediately upon receipt of said securities proceed to foreclose upon them, and that, if the sale of said securities under such foreclosure was delayed by reason of any injunction, the time should be extended until after said injunction was dissolved, but not more than 6 months from the date of that supplemental agreement; and meanwhile Cherry was to have an irrevocable power of attorney to vote said capital stock. On June

27 and 28, 1916, Evans and Cherry had certain dealings with relation to this stock and these bonds.

In order to determine whether Cherry had completed his contract with Evans before the former became receiver, as he here claims, it is proper to examine further the Bliss-Cherry contract and its supplement and the Evans-Cherry contract. The Bliss-Cherry contract and supplement required that when Cherry had done certain things he should take title to the bonds and stock they were to assign him, and all the officers and directors of the company should resign and Cherry should have an irrevocable power of attorney authorizing him, in the name of Bliss and the others who had a lien on said bonds, but without expense to them, to foreclose the pledge of said bonds, and that upon such foreclosure the interests acquired at said foreclosure should immediately pass to Cherry and if, by reason of any injunction, control by Cherry of the foreclosure of such securities should be delayed, certain payments to be made by him should be extended. The proposition by Cherry to Evans, of date May 5, 1916, which preceded the Evans-Cherry contract, provided that, if accepted, certain things which Evans was to deliver to Cherry should be deposited in a bank for Cherry but not delivered to Cherry until the bonds which Cherry was to obtain for Evans were either delivered to Evans or placed in said bank for him, and that the stock and bonds which Cherry was to obtain for Evans should carry with them a majority of the outstanding stock, so that the control of the company should rest in said stock and the same should be voted by Evans for the mutual interest of both. The Evans-Cherry contract provided that Cherry would use his best endeavors to consummate the purchase of said bonds, stock and securities from Bliss, and to acquire the remaining two-seventh interest in the Estee agreement and securities therein mentioned, and that he would deliver said bonds, stock and secur-

ities to Evans as soon after they were received by Cherry as Evans should require the same to be done. Cherry was appointed receiver on July 10, 1916. A few days later a meeting of the company was held at which all the officers and directors resigned, pursuant to said Bliss-Cherry agreement, and Cherry had himself and his attorney and others selected by him elected directors, and they elected Cherry president. Cherry therefore immediately upon becoming receiver obtained control of the board of directors and of the corporation. He did not need this control merely in order to perform his duties as receiver. Obviously he was seeking to obtain that control which he had contracted to deliver to Evans in the end. The main thing not accomplished when he became receiver which the Evans-Cherry contract required of him was to obtain the bonds pledged to the seven old directors as described in the Estee agreement. Therefore the act of Cherry in obtaining control of the board of directors and of the officers was manifestly further performance by him of the Evans-Cherry agreement, and was placing himself in a position where he could control the corporation itself so far as the proposed foreclosure was concerned. It was evidently expected that Cherry could immediately obtain a foreclosure on said securities. Under date of October 4, 1916, Cherry wrote Watson, cashier of the First National Bank, Aurora, depositing certain bonds to take the place temporarily of some of these bonds on which he was to foreclose, and explaining that J. C. Murphy had instituted proceedings to prevent the distribution of the securities covered by the Estee agreement, and asking Watson not to distribute the securities in his possession unless convinced that all parties had complied with the contract. Murphy, a lawyer, had filed a claim against the company for $100,000 for legal services, and this was being contested. Murphy learned of this attempted sale of the securities covered by the Estee agreement

and filed some pleading to prevent the consummation of the sale, and the foreclosure upon these securities was delayed thereby. Under date of August 16, 1916, Cherry wrote Evans stating what bonds it was contemplated that Evans should receive under their agreement, showing that Evans had not yet received them, and then he stated that this "is based on our ability to acquire all the bonds called for in our agreement." This letter, written more than a month after Cherry was appointed receiver, must mean that it was not yet ascertained that Cherry could perform his contract with Evans, and it is plain from all the evidence that he meant that it was not yet determined whether Cherry could obtain the securities named in the Estee agreement. Under date of December 29, 1916, Cairo A. Trimble, who was not only attorney for Cherry as receiver but was also Cherry's personal attorney, wrote Cherry at much length, discussing the proposition of settling with Murphy, obviously with the purpose of removing that obstacle to obtaining a foreclosure of the securities held under the Estee agreement. Under date of January 29, 1917, a settlement with Murphy was effected and the obstacle to a foreclosure was removed. On February 2, 1917, John Faissler, an attorney, secured possession of the five separate Estee agreements held by Bliss, Richmond, Klein, Loser and Ravlin, covered by the Bliss-Cherry agreement, and also obtained the consent of George and Erlenborn to allow their names to be used in the foreclosure proceedings. On February 6, 1917, Watson (cashier of the First National Bank of Aurora) wrote Cherry that Evans had that day left with Watson a note for $20,000 "for your use in connection with the purchase of the securities of the De Kalb road that were deposited with W. C. Estee." On the same day Faissler filed a bill, in the name of the seven persons above named, to foreclose and sell the bonds described in the

Estee agreement. It is claimed and denied that Faissler was acting for Cherry. Several of the beneficiaries in the Estee agreement testified that Faissler told them that he was acting for Cherry. That evidence may have been incompetent. They also testified that they did not hire Faissler and did not pay any of the expense of that foreclosure, and that they supposed it was being done by Cherry pursuant to his agreement with them. Cherry did advance the costs of that proceeding and the same was repaid to him by the master, and Cherry's receipt therefor is in evidence.

On the same day that the bill was filed, Trimble filed the answer of Cherry and of the company. The proof seems to show that, as originally drafted, that answer originally contained the name of Trimble as a complainant, and that that was erased. There is in evidence a form of a decree in that suit, prepared by some one, in which Trimble was named as a complainant. This was not signed by the trial judge. These papers which were not used seem to have been prepared for the purpose of paying from the foreclosure of these securities not only the sums due the seven old directors under the Estee agreement, but also a certain $10,000 note then held by Trimble and hereinafter described, which including of said $10,000 note Faissler prevented. The association of Trimble with the preparation of the bill and of the decree aids in the conclusion that Cherry was in fact causing said foreclosure suit to be carried through at his own expense. Cherry testified that on the day of the sale he paid the master $200, and Faissler $75. This was only in line with what he agreed in the Bliss-Cherry contract. There are in evidence three letters written by Cherry to Edwin A. Bayley of Boston, Massachusetts, dated respectively April 18, April 26 and May 1, 1917. They are too long to be all inserted here. In the one of April 18, he tells Bayley about the Bliss-Cherry contract,

and that when he made that contract he expected to take over the $50,000 of first mortgage bonds himself, and make final payment with them, and tells how the persons with whom he had that contract prevented his securing them at the time agreed upon. This implies that he had not yet made final payment to them and had not yet secured that which he was to deliver to Evans. In his letter of April 26 he says: "My personal holdings of bonds depends on the settlement between me and the estate of H. H. Evans, late of Aurora, Ill., deceased, under which the estate may take all we have, or I may take $40,000.00 first mortgage bonds or some part thereof. (I bought $40,000.00 first and $185,000.00 of general mortgage bonds, in connection with Evans.) In this same deal I secured $390,000.00 of stock, one-half of which comes to me, although I have refused to accept it from the bank when it was deposited on account of the liability which might be attached to it on account of no payments having been made on the same." Under date of May 1, he wrote: "Answering your questions regarding my individual interest in the company, it depends upon my settlement with the Evans estate, as I have $35,000.00 cash in that deal, and have offered to take my share in first mortgage bonds, but will not take any part of the general mortgage bonds secured in the deal. My stock interest is $190,000.00 which was secured with the bonds without cash investment." Exhibit 47 in evidence is an order, dated March 12, 1917, by H. H. Evans on F. B. Watson, elsewhere shown to be cashier of the bank, directing him to "turn over to my son, Arthur Evans, the bonds of the Chicago, Aurora and De Kalb R. R. amounting to $228,000.00, which you have in deposit box, also key to same"; and the following receipt dated March 14, 1917, written below the order, and signed by Arthur R. Evans:

"Received the above bonds of F. B. Watson, $185,000 general bonds and $43,000 of first mortgage bonds.

SECOND DISTRICT—MARCH, 1920.        225

Ravlin v. Chicago, Aurora & De Kalb R. Co., 217 Ill. App. 213.

The $185,000 of general and $40,000 of first bonds being a delivery on a certain contract from F. W. Cherry, the same to be settled for with F. W. Cherry under the terms of his agreement with H. H. Evans.'' This Exhibit 47 is all in the handwriting of Cherry, except the signatures. H. H. Evans died March 27, 1917, and his son Arthur R. Evans became executor of his will. Afterwards Cherry made a statement of these matters up to April 13, 1917, to the executor, in evidence as Exhibit 64. He charged H. H. Evans with 60 per cent of the amount of the bonds Cherry was to acquire for him under the Evans-Cherry contract; and credited him, besides other matters, with payments by Evans to Cherry, after the latter became receiver, as follows: Sept. 22, 1916, $8,000; Oct. 4, 1916, $20,000; Feb. 13, 1917 (the day of the master's sale of the Estee collateral), $20,000; and on a date not stated, but apparently later, $20,000 in H. H. Evans' secured paper. It showed an apparent balance against Evans of $15,042. Cherry furnished a later statement showing $14,706, due him from the Evans estate growing out of these transactions. On August 15, 1917, Arthur Evans, executor, and Cherry executed a writing, in evidence as Exhibit 9. It professed to be a settlement of the Evans-Cherry contract. It agreed that Cherry should deposit in escrow all stocks and bonds he held in the De Kalb company, ''including the assignment of any interests he may have in $387,600.00 per value of stock deposited by Bliss et al., in the First National Bank of Aurora, Ill., together with all stock owned or held in the name of'' the present directors of the company, together with Cherry's resignation as receiver and director and the resignation of all the other officers and directors. It agreed that Evans should deposit in escrow in cash and notes $12,000; that when Cherry's resignation as receiver had been accepted the resignations and stocks and bonds should be delivered to

Evans and the cash and notes to Cherry, and this should discharge Evans and the estate of H. H. Evans from all claims of Cherry against them arising out of the Evans-Cherry contract; and the receipt of the stock, bonds and resignations should likewise dis- charge Cherry from his obligations. Therefore, while Cherry was receiver he received from Evans and his estate at least $72,000.

Cherry gave evidence to the effect that all he was to do under the Evans-Cherry contract was completed on June 27 or 28, 1916. It is claimed he is corrobo- rated by the evidence of Watson. When all the testi- mony of the latter is read and considered in connection with various exhibits in evidence, we think the corrob- oration is not as strong as is claimed.

When all the facts and circumstances are considered, including many details we have not mentioned, we are of opinion that the court was warranted in believing that said foreclosure suit was instituted and carried through for the benefit of Cherry and at his expense, and that he was merely doing that which he agreed with Evans to do, and that his compensation was not earned until that proceeding was conducted. The orig- inal answer of Cherry to the petition of Doan and May, also adopted as his answer to the intervening petition of Gunsel (found in the additional record filed by leave of court), admitted that after Faissler bid in these securities at the master's sale, the master deliv- ered said securities to Faissler and Faissler then de- livered to Cherry the five-sevenths thereof covered by the Bliss-Cherry agreement, and it is clearly proved that just before or just after that sale Cherry pur- chased from George and Erlenborn, respectively, their interests in said securities, and thereby Cherry became the owner of them all, and he delivered them all to the First National Bank of Aurora or to F. B. Watson, its cashier, in accordance with the Evans-Cherry agree- ment.

It is argued that this decree can only be sustained for fraud, and that in that view the intervening petitions were insufficient to support the decree because they allege conclusions and not facts. The sufficiency of the petitions seems not to have been questioned in the court below where they could have been amended. We think the facts upon which relief was granted were sufficiently stated, and it is not important whether or not the method by which Cherry obtained profits by secret dealings in the securities of the company while he was receiver be called a fraud in the pleadings.

In the original hearing in this court Cherry did not contend that the decree of the court below was erroneous as to the amount of the profits gained by him under the foreclosure upon the securities in question, if he was chargeable with the profits under the facts. As to that his original brief said: ''It is apparently true from the record that the commission made by Cherry in his transactions with Evans was large. That transaction, however, is not in question here and cannot be.'' He elsewhere contended that proof should have been made of the fair market value of the securities sold at the master's sale and that he could only be charged in any event with that fair market value. We do not concur in that view. In no other respect was the amount found as Cherry's profits questioned by him in his original brief, his main contention being that his transactions with Evans were closed on June 28, 1916, and that he had no connection with or interest in the later transactions concerning the securities involved in the Bliss-Cherry and Evans-Cherry contracts. Not having otherwise questioned the decree as to the amount of his profits in his original brief, he could not raise any other question on that subject even in his reply brief on the original hearing. *Schumacher v. Bell,* 164 Ill. 181; *Spring Valley Coal Co. v. Buzis,* 213 Ill. 341; *Morton v. Pusey,* 237 Ill. 26; *Wetmore v. Henry,* 259 Ill. 80. In the latter case, after

stating that a certain point was not raised in appellant's original brief, the court said: "Not having been thus raised, under our rules it cannot be thereafter raised by reply brief, in oral or printed argument, or on a petition for a rehearing. Not having been raised in the brief, the point was waived." In *Morton v. Pusey, supra,* plaintiff in error raised a new point in his reply brief. The Supreme Court ignored it. In *Schumacher v. Bell, supra,* the court said: "When errors are not insisted upon by appellant in his opening brief, it is too late to present them in his reply brief." So Cherry was precluded by his original brief from questioning the decree of the court below as to the amount of his profits or the manner in which that court arrived at that amount, except to argue that it should have been determined by the market value of the securities rather than by the price which he actually received for them. But even in his reply brief he made no further answer on that subject except to restate the positions above set forth, and to say that the computations made by the attorneys for defendants in error "are unsupported, unjustifiable and grotesquely absurd," and that "no living human being can take this record and tell upon what they are based." This of course was not argument, and did not aid the court, and was of no effect in a reply brief, under the authorities above cited. Accordingly, in our original opinion, we said: "Appellant does not seriously contend that the amount of that profit was less than the court found."

In the petition for a rehearing and the reply to the brief answering the same, Cherry questions for the first time the items which produced the profit found by the court below. These items and the proof which tends to sustain or defeat them cannot be first presented upon a rehearing. Our rule 26 (137 Ill. App. 631) says: "The petition for a rehearing shall state

concisely the points supposed to have been overlooked or misapprehended by the court, with proper reference to the particular portions of the original briefs and abstracts relied upon. Such petition shall not contain a general reargument of the cause.'' Under a rule containing similar language the Supreme Court has often held that on a petition for a rehearing new points which were not presented in the argument of the cause will not be and should not be considered, and that points not made in the original brief are waived, and cannot be raised for the first time on petition for rehearing; and this has been said in cases where, if raised in the original brief, the point would have been serious and important. *Wandschneider v. Wandschneider*, 282 Ill. 286; *People v. Snyder*, 279 Ill. 435; *Arkley v. Niblack*, 272 Ill. 356; *People v. Chicago & A. R. Co.*, 253 Ill. 191; *Peabody Coal Co. v. Northwestern El. R. Co.*, 230 Ill. 214; *Ladies of Maccabees v. Harrington*, 227 Ill. 511; *Eustace v. People*, 213 Ill. 424; *Ellis v. Sisson*, 96 Ill. 105. Numerous other authorities, including decisions in the Appellate Courts, are to the like effect. We therefore conclude that the proof for and against the items which the court below found produced the aggregate amount of profits obtained by Cherry from the foreclosure of the securities in question while he was receiver, are not subject to investigation on this rehearing. We are, however, of opinion that the decision of the court below on that subject is correct and supported by the proofs. Further, there is evidence tending to show that while Evans agreed to pay 60 per cent on the securities which would give him the control of the corporation, he was willing to pay as high as 70 per cent to obtain the same, if necessary. In the suit for the foreclosure upon said securities, Cherry did not reveal to the court that he had a contract in his possession by which he was to be paid 60 per cent by Evans nor that he knew Evans was willing to pay even 70 per cent if neces-

sary. We think it obvious that it was the duty of Cherry as receiver to reveal these facts to the court and not to permit a sale, as he did, for a much less sum, and that he was not at liberty while receiver to so conduct this proceeding as to secure for himself the profit thereby acquired.

Under date of June 19, 1911, the company issued to Evans a note for the principal sum of $10,000, which was unsecured and was apparently of little value in 1916, and it was turned over by Evans to Cherry under their contract of June 12, 1916. Cherry delivered it to Trimble, his attorney, to apply in payment for personal services which Trimble had rendered to Cherry outside of the receivership. Trimble transferred the note to a bank in Princeton, and Cherry, while receiver, paid $3,000 to the bank upon said note, of which Trimble was still the real owner. This payment was upon an old unsecured debt of the company, and was not authorized by any order of court, and was prejudicial to the secured creditors, and should not have been made by the receiver, and was properly charged back to the receiver.

Cherry employed Trimble to act as attorney for the receiver, and he did so act during the entire time of Cherry's receivership, and Cherry paid him therefor from time to time sums amounting to $2,350. It is alleged that this was without authority from the court, and the court below directed Cherry to pay it back to the present receiver. The appointment by Cherry of an attorney and fixing his compensation was not without authority of the court. In the order appointing Bliss and Kirby receivers, it was provided that they should have authority to employ all necessary and proper agents, attorneys, officers and laborers, and to fix and alter the compensation of said agents, attorneys, officers and laborers, subject to the revision of the court. In the order appointing Cherry receiver, he was given like powers and duties as were conferred

upon said Bliss and Kirby by the order appointing them. Therefore Cherry did have express authority from the court to employ an attorney and to fix his compensation, subject to revisions by the court. Trimble did perform much important service for the receiver. Cherry advised with him concerning every thing that was done in running the railroad. Trimble filed various petitions for the receiver and obtained court orders thereon, and among these were orders for repairing certain bridges along the line. There was a death claim against the company. He filed a petition and secured an order authorizing a settlement of that claim. The same thing was done with a personal injury suit against the company. Trimble spent many days defending against the $100,000 claim filed by Murphy. He assisted in the settlement of that claim at an expense to the company of only $2,500. He prepared the final report of the receiver and the order of court approving it. It is manifest that the attorney for an operating railroad must have much occasion to give legal advice to the man in control of it. Trimble testified that the fees paid him were not only usual and customary but were in his opinion low for such services. This evidence is not contradicted. The reason for rejecting entirely these fees, paid by Cherry to his attorney under this order of court, grows out of certain matters already referred to which occurred in connection with the foreclosure upon said collaterals. Trimble sought to have said $10,000 Evans note included in the benefits of the decree foreclosing the securities mentioned in the Estee agreement. Trimble testified that the collateral notes given by the company contained a clause to the effect that the Company had deposited with the payee collateral securities, for the payment of that note and all and any other liability or liabilities, direct or contingent, now or before owing by said railroad company; and he conceived the idea that under that provision, this note might come in for

any excess there might be in the proceeds of the sale to satisfy the decree, or that it might prorate with the other notes, and that that provision might be held to cover all liabilities of the company. When he found that Faissler and the beneficiaries under the Estee agreement would not agree to it, he withdrew that attempt. He drew some pleading to ask for that relief, which was not filed. It is intimated in argument that he prepared a decree, which included that note, and that that was signed by the judge and afterwards was withdrawn. Such a decree was prepared, but we do not find any evidence in the record that it was approved by the judge. The position taken by Trimble was incorrect. One of the company's collateral notes is in the record, but, though containing very full provisions of the kind indicated, it limited them to debts due the payee of the note. We are of opinion, however, that the fact that Trimble urged an erroneous idea of the law on the subject ought not to deprive him of the compensation which the receiver had paid him under the authority of the orders of court above specified, and ought not to require the receiver to refund that compensation, and that as Trimble's testimony as to the value of his services was not disputed, the provision of the decree requiring Cherry to refund the fees paid said Trimble should be reversed. If the proof had shown a charge by Trimble against the receiver for services in that foreclosure suit, that charge might have been properly rejected, but Cherry employed another attorney in that case, and it does not appear that the receiver paid Trimble anything for legal services in foreclosing upon those collaterals.

We are of opinion that it is a sufficient punishment to the receiver to lose the profits which were made upon the foreclosure of the securities under the Estee-Cherry contract, without depriving him of his ordinary compensation for his services as receiver; and that the sum which he credited to himself for such

Ravlin v. Chicago, Aurora & De Kalb R. Co., 217 Ill. App. 213.

compensation is not shown to be unjust. He appears to have been diligent in the business of the company while he was receiver, and it does not appear that the compensation originally allowed him was excessive. The cross error on that subject is not sustained.

It is urged, under the cross errors, that the receiver should have been required to pay interest on the profits charged against him, and on the $3,000 paid the Princeton bank. The decree against the receiver was rendered on July 16, 1918, and not only bears interest at 5 per cent per annum by statute but also by the express terms of the decree. Portions of Cherry's profits were received by him at different times, and we do not find any sufficient basis in the evidence for charging interest from any particular date before the final settlement of these matters between Cherry and Arthur Evans, executor, on August 15, 1917. From that date to July 16, 1918, Cherry should pay interest at 5 per cent per annum on said profits. The receiver paid $3,000 to the Princeton bank on May 10, 1917. This was a payment on the note heretofore mentioned for $10,000 given by the company to H. H. Evans on June 19, 1911. As that payment was properly charged back to the receiver by the decree, the receiver should also have been charged with interest on said $3,000 at 5 per cent per annum from May 10, 1917, to the day of the decree. But this paid $3,000 of a debt of the company, and the decree should have awarded Cherry the position of an unsecured creditor of the company for $3,000, with a right to interest thereon from May 10, 1917.

The decree is therefore reversed as to $2,350 paid by the receiver to C. A. Trimble as attorney fees, and as to the matter of interest upon the $3,000 paid the Princeton bank, and as to the failure to charge Cherry interest on said profits, and is in all other respects affirmed; and the cause is remanded to the circuit court of Kane county, with directions to modify its decree

in conformity with this opinion. Costs will be taxed for the additional abstract. Harvey Gunsul, as receiver, will pay one-tenth of costs of this court, and Frank W. Cherry will pay the rest of said costs.

*Affirmed in part, reversed in part and remanded with directions.*